IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:                                              Case No. **09-05835-lmj7**

**Jeffrey L. Hopkins**,
**Diane L. Hopkins**,

        Debtors

**MEMORANDUM OF DECISION**
**(date entered on docket: April 1, 2014)**

      Chapter 7 Debtors Jeffrey L. Hopkins and Diane L. Hopkins ("Jeffrey" or "Diane," and collectively "the Hopkins") contend that Creditor Marc S. Harding ("Marc" or "Harding") violated the 11 U.S.C. section 524 discharge injunction by commencing a lawsuit against them to collect the balance of a prepetition debt that they had not reaffirmed but had continued to pay postpetition until it became financially impossible. They seek actual damages, attorney fees, and punitive damages. Having reviewed the record and the arguments of the parties, the Court enters its decision finding that Harding willfully violated the discharge injunction and acted with a clear disregard of and disrespect for the Bankruptcy Code and, accordingly, concluding that Debtors are entitled to a judgment against Harding for actual damages in the amount of $1,500.00, for attorney fees in the amount of $1,775.00 (Karen A. Taylor) and $9,000.00 (Marks Law Firm), and for punitive damages in the amount of $10,000.00.

      The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the United States District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(1).

BACKGROUND

Harding has been an attorney since 1973. He is also a doctor of osteopathy. For most of the last quarter century, his law practice has focused primarily on the representation of plaintiffs in personal injury cases. He hired Diane, who had some experience working with medical records, in the spring of 2007. Her brother Don Charron, also known as Frank Charron, ("Charron") had been working for Harding for a few years. Harding and Charron were close personal friends.

The Hopkins were contemplating seeking bankruptcy relief in the fall of 2007. Instead they obtained financial relief from Harding. He incurred a loan in his name from Iowa State Bank for approximately $30,000.00 at a favorable interest rate. He gave the proceeds to the Hopkins to assist them in paying off their existing debts. In return, they agreed to pay back Harding's lender directly. Harding and the Hopkins did not put the agreement in writing.

In late 2008 or early 2009, the Hopkins once again were contemplating seeking bankruptcy relief. Harding did not incur another personal loan for their benefit. Instead his brother John Harding ("John"), who practices law with him, directed the Hopkins to Attorney Karen A. Taylor ("Taylor") who filed a Chapter 7 petition for the Hopkins on November 30, 2009. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Hopkins indicated they owed Harding $15,000.00 related to the 2007 personal loan. Harding did not file a complaint objecting to the Hopkins' receipt of a general discharge of all their debts and did not file a complaint to determine that the debt they owed him was not covered by the general discharge. Though Diane told Harding that she and Jeffrey intended to continue to pay off the personal loan and though John assisted

Diane in the review of two reaffirmation agreements related to other debts, the Hopkins and Harding did not enter into and file a reaffirmation agreement in this case.

The Hopkins received a general discharge of their debts on March 9, 2010, and this no asset case was closed on March 24, 2010. In May of that year, Diane left her employment with Harding's law firm. Though Diane testified that some unspecified activity at the firm scared her, she identified health benefits as the primary reason for leaving. (Harding's law firm provided health insurance for its employees but not for the employees' families; the new employment provided family coverage.)

The Hopkins routinely made monthly payments directly to Iowa State Bank until the summer of 2011. Specifically, on July 5, 2011, Diane sent Harding an e-mail stating: "I just realized that I hadnt [sic] paid the loan (the one we filed bankruptcy against) so much going on and I cant [sic] get it there today. I can either pay it late or send it to your office later in the week." (Exhibit 5.) In an e-mail response the same day, Harding stated: "Just pay it as soon as you can. I'm out of state so can't do anything myself and am maxed out at the bank anyway. Doing my best to keep all the balls in the air." (Id.)

In November of 2011, the Hopkins ceased making payments to Iowa State Bank. In an e-mail dated November 4, 2011, Diane explained to Harding:

> Marc I don't know how to start this but to say how flippin [sic] sorry I am that I cant [sic] pay this loan. I have been off of work for over a month because my hip is frozen and am not able to sit long or stand. I have been advised by my doctors that the process of disability is a long one but in my best interest. This began the week before mom was diagnosed. Actually it stems from years ago and it finally let go. To top it off now my brother and I dont [sic] know whats [sic] going to happen with him. I have tried by best ,,,, I actually worked longer by taking more pain pills just so I could try to pay this.. Im [sic] just not physically able. I will be starting the disability process and hope it goes smooth at that time I hope to be able to do my best to pay you back.

> I will talk to Karen Taylor to find out if I need to do anything/also if she can help me with the disability,. I cant [sic] even bring myself to talk to you about this Im [sic] so sorry-it gives me anxiety when I think about it. I know I put this on my bankruptcy protection but still I wanted to do what was in my heart and that was to do my best to pay you back if I could. Maybe this is just another bump in the road and I will be able to send you some payments in the near future. This is due on the 5th and its 403.00. You already know that though. I am sorry.

(Exhibit 6.)

> In an e-mail dated November 9, 2011, Marc responded:
>
> Just checked with Iowa State and almost $19,000 is left on the loan you got using my credit rating. We set this up with no benefit to me but a big benefit to you by lowering your monthly payments and a huge reduction in the interest rate. I've been borrowing myself to keep the doors open, so I can't make the payments myself. I'll get the bank to roll the next two payments to the end. When can you resume your payments? Do you expect to make the rest of the payments?
>
> When I know this, I'll talk with the bank again and see what they will work out.
>
> While we are struggling I've continued to visit your brother in the hospital and to pay him. I don't want my own financial struggles to affect him or the other people that work with me. I wanted to work with you and went out on a limb to do so, with your word that you'd take care of it. I want to work with you on this, but need something definite. Will you pay it out of your disability?

(Id.)

On December 12, 2011 Harding commenced a pro se lawsuit in the Iowa District Court in and for Polk County against the Hopkins based on detrimental reliance, unjust enrichment and entitlement, fraud, negligent infliction of emotional injury, and intentional infliction of emotional injury. In each of the five counts, Harding alleged that: Charron had worked for his office beginning in April 2004 and had proposed the hiring of his (Charron's) sister; Diane began working at the office on or about May 7, 2007; the Hopkins subsequently informed him that they had solid credit ratings and were current in all their bills, but they had taken on $30,000.00 in credit card debt related to closing

on the sale of their home in the southwest; the Hopkins requested he work with them to bring their interest rate down because they had not yet established credit and a new banking relationship in order to refinance that debt; he obtained a bank loan in his name on November 15, 2007 in the amount of $30,184.00 at 7.35% by using his credit history and rating and arranged for the funds to go to the Hopkins; the arrangement was of no benefit to him but saved the Hopkins thousands of dollars; Diane voluntarily left her employment with his law firm for another job on May 31, 2010; with the exception of requesting the deferment of one payment in the summer of 2011, the Hopkins made monthly payments to the bank through October 2011; in October of 2011, Charron was diagnosed with Stage 4 cancer and went on leave, and Diane had been taken off work for three weeks due to a temporary hip issue; in November 2011, the Hopkins stated they could not make any more payments because Diane was filing for social security disability at the age of 52; the Hopkins repeatedly told him that he did not need to take further action because they would pay off the bank loan in full; and $19,110.69 plus interest at 7.35% was currently due and owing.  Harding made no mention of this bankruptcy case in his petition.  He also filed a jury demand.

      Sometime on December 12, 2011, Harding went to Taylor's office to show her a copy of the petition.  According to her testimony, Taylor expressed concern that the filing of the lawsuit violated the Bankruptcy Code because the Hopkins had not reaffirmed the debt in this case.  Harding left her with the impression that he thought he had nothing to lose even if it turned out the state court concluded the debt had been discharged.

On December 14, 2011 Andy Goerlitz from Harding's law firm served the original notice, petition and jury demand on Diane in person at her home and on Jeffrey by leaving the documents with Diane. According to her testimony, Diane first learned Charron's cancer might have advanced to Stage 4 when she saw that allegation in Harding's petition.

On January 4, 2012 Taylor filed an appearance and motion to dismiss on behalf of Diane Hopkins. In the motion to dismiss, Taylor brought this bankruptcy case to the state court's attention—specifically noting the case number, the date of the petition, and the date of the discharge and specifically pointing out that Harding was listed on Schedule F, received notice of the case and did not object to the discharge of the debt that was the subject of his lawsuit. In paragraph 6 of the motion, she stated: "That the filing of this Petition is in violation of the Automatic Stay [sic] and in violation of the Federal Bankruptcy Laws as this debt was discharged and cannot be pursued in the district Court under 11 USC 524(3) [sic]." (Exhibit 1 at 51.) In paragraph 7 of the motion, she stated: "That the Petition herein filed should be dismissed and the Plaintiff should be sanctioned for violating the automatic stay [sic] by the filing of this Petition and the Defendant should be awarded attorney fees for defending this matter." (Id.) To the motion she attached the first page of the two-page "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines," the first page of the two-page "Discharge of Debtor," and the page from Schedule F that listed the debt in issue. (Id. at 52, 53 and 54 respectively.)

On January 5, 2012 Harding caused a subpoena regarding the production of documents to be issued on Wells Fargo Card Services regarding a debt the Hopkins

had listed in this case. He specifically mentioned the case number and the date of filing.

On January 13, 2012 Harding filed a resistance to the motion to dismiss. He contended that the original pleadings demonstrated that "the actions complained of are subsequent to the filing and include actions taken in reliance upon Defendants [sic] promises," expected that discovery would lead to additional evidence, and anticipated that there would be disputed factual matters for a jury to decide. (Exhibit 1 at 59.) He also filed a notice of intent to file a notice of default as to Jeffrey. (On January 23, 2012 Taylor filed an appearance on behalf of Jeffrey and joined him in the motion to dismiss.)

On January 30, 2012 Harding filed a one-page legal memorandum in support of his resistance to the Hopkins' motion to dismiss. In that document, he cited to Hagenson v. United Telephone, 164 N.W.2d 853, 855 (Iowa 1969) for the proposition that a motion to dismiss a pleading is limited to the contents of that pleading and admits the truth of all the well pled relevant facts. He argued:

> Defendant attaches documents to its Motion that are outside the Petition in an attempt to raise an issue that is a mixed question of fact and law regarding a bankruptcy action that is not currently pending. The matter Defendant attempts to raise is not something to be decided on the face of a Petition, but rather is an issue for summary judgment or for trial.

(Exhibit 1 at 64.)

At the February 1, 2012 nonevidentiary hearing on the contested motion to dismiss, Taylor contended that the grounds Harding was raising in his lawsuit were ones he should have pursued in this bankruptcy case as an objection to his debt being discharged. She reasoned that "[s]ince he failed to do that, he is now violating the automatic stay [sic] by proceeding to file a lawsuit to collect this debt, that this debt has

been discharged in bankruptcy." (Tr. 4 ll. 9 to 15.) She requested the lawsuit be dismissed, Harding be sanctioned and her client be awarded attorney fees.

The state court judge questioned whether he had the authority to sanction Harding for a violation of a federal court order. He observed that "what you're saying is that his filing of his Petition was in violation of the automatic stay that was in effect not only during the discharge but since the discharge – not only during the bankruptcy, but since the discharge was entered and granted to the defendant here." (Tr. 5, ll. 4 to 9.) He concluded that the Hopkins could only pursue relief from Harding's lawsuit in federal court.

As for the merits of the Hopkins' motion to dismiss, Harding reemphasized his contention that the inquiry should be limited to the pleading under consideration. He stated that "there should be no other documents that are considered, no judicial notice, none of those kinds of things." (Tr. 7, ll. 1 to 3.) He concluded his argument by observing that "a substantial portion of what we have here – we do lay out some of the background on it, but a substantial portion of this is conduct that occurred – that's occurred basically during the last couple of years, so it would even go beyond that." (Tr. 7, ll. 12 to 16.)

On February 3, 2012 the state court judge entered a ruling denying the motion to dismiss based on the reasons he stated on the record and the reasons stated in Harding's resistance. On February 6, 2012 Harding filed a first amended and substituted petition in which he added a count based on reaffirmation. In addition to the factual allegations he set forth for the other counts in the original petition and repeated in the amended and substituted petition, Harding further alleged in support of the

reaffirmation count that the Hopkins were willing to reaffirm the amount they owed him and had done so by their actions. He requested a declaratory judgment to that effect. Once again, Harding made no mention of this bankruptcy case.

On February 13, 2012 the Hopkins, through Attorney L. Ashley Zubal ("Zubal"), filed both a motion to reopen this case and the pending motion for sanctions. On February 15, 2012, this Court granted the motion to reopen. On February 17, 2012, this Court scheduled an evidentiary hearing on the motion for sanctions for March 27, 2012. On March 1, 2012 Attorney Steven P. Wandro ("Wandro") filed his appearance on behalf of Harding.

On March 22, 2012 the state court judge filed a notice that he would be conducting a conference on April 13, 2012 to schedule a trial in Harding's lawsuit. On March 26, 2012 the bankruptcy judge, who was originally assigned to this case and who was assigned again automatically upon the reopening, held a status conference with the attorneys of record to discuss a recusal issue that had arisen. As a result of that hearing, she entered an order canceling the March 27, 2012 evidentiary hearing and directing that either the Hopkins withdraw their motion for sanctions or Harding file his response or objection no later than April 10, 2012.

On April 2, 2012 Harding filed a dismissal of his lawsuit in state court. He did not indicate that he was doing so with prejudice. On April 3, 2012 Charron died. On April 10, 2012 Harding filed his objection to the Hopkins motion for sanctions. On April 12, 2012 the assigned judge recused herself, and this case was reassigned to the author of this decision. Pursuant to a telephonic hearing on May 8, 2012, this Court rescheduled the evidentiary hearing for September 21, 2012.

Over the course of her testimony on direct, cross and redirect, Diane readily admitted that she told Harding she intended to pay the debt that she and Jeffrey owed him despite the fact that the debt had been discharged. More often than not, she testified that she felt she should repay him, rather than that she had to repay him. In sum, she appreciated the financial assistance Harding had provided and felt terrible when there came a point in time when she could no longer make the payments.

As for the actions Harding took to collect the discharged debt when the voluntary payments stopped, Diane testified that she was very upset to learn from the petition that her brother had Stage 4 cancer. When she saw the fraud count, she was afraid she might go to jail. She feared Jeffrey and she would lose their home if they had to pay Harding. Being deposed at Harding's law firm during the course of the state court proceeding scared and humiliated her. She felt bullied by Harding. She had lost sleep and weight over the ordeal. Jeffrey and she had had fights over the matter.

Jeffrey likewise admitted that he believed paying the discharged debt was the right thing to do, but Diane and he were no longer in a position to do so. He was not willing to pay the discharged debt in lieu of making house payments. He found it painful to see Diane become upset and despondent over Harding's lawsuit—the inclusion of Charron's condition in the petition in particular. He felt belittled at the deposition in Harding's office, and he resented Harding taking them to court. He wanted reimbursement of the attorney fees Diane and he had incurred as a result of Harding's actions to collect the discharged debt, and he wanted $462.00 in lost wages related to taking time off work to be deposed and to appear in court.

Taylor testified that Exhibit 14, a billing statement covering her representation of the Hopkins in Harding's lawsuit from December 15, 2012 through February 7, 2012, was on the conservative side. She had not included items like reviewing subpoenas. In addition to the $1,275.00 reflected on the statement, she sought 2 hours of compensation at her $250.00 rate for attending the hearing on the Hopkins motion for sanctions. With respect to the impact of Harding's lawsuit on the Hopkins, Taylor observed in particular that Diane was upset about Charron's medical condition being set forth in the state court proceedings

Over the course of his testimony on direct, cross and redirect, Harding stated that he felt "betrayed" by the Hopkins. He emphasized how he had "gone out on a limb" for them and was left "holding the bag." He commented about how he had relied on Diane's representation that Jeffrey and she were credit-worthy. Based on records he had subpoenaed from Prairie Meadows Racetrack and Casino, he questioned whether the Hopkins had gambled away most, if not all, of the $30,000.00 loan. From conversations he had had with Charron, Harding alleged Diane had convinced Charron in the summer of 2011 to let her put a charge for a central air-conditioning unit for the Hopkins' home on his credit card. According to Harding, Charron did not believe Diane would pay him back and regretted having allowed her to add the charge to his card.

With respect to his rationale for proceeding with his lawsuit despite not having protected his interest by filing a reaffirmation agreement or a complaint to determine dischargeability of debt or to object to discharge, Harding reported that he had consulted with John and David Hirsch, another attorney in the firm. They agreed that <u>Beneficial Finance Company of Waterloo v. Lamos</u>, 179 N.W.2d 573 (Iowa 1970) would

support an argument that the Hopkins' promise to pay the discharged debt after bankruptcy was binding. He reasoned that the continued payments were in the nature of specific performance.

## APPLICABLE LAW

11 U.S.C. section 524(a)(2) states that a discharge under Title 11 "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). In DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002) the Eighth Circuit elaborated:

> [A]fter a debtor receives a discharge, a creditor cannot seek to recover a discharged debt from the debtor. Further, any postpetition agreement, "the consideration for which, in whole or in part, is based on a debt that is dischargeable," is enforceable only if the agreement complies with the strict requirements of the Bankruptcy Code. § 524(c). An agreement that complies with § 524(c), called a reaffirmation agreement, must conspicuously inform the debtor of certain rights the debtor has and must be filed with the bankruptcy court. Id. Notwithstanding the absence of a valid reaffirmation agreement, "[n]othing contained in subsection (c) … of this section [524] prevents a debtor from voluntarily repaying any debt." § 524(f).

Thus, under section 524, a creditor is left with two options: "It can obtain the debtor's 'reaffirmation' of the debt under § 524(c), which requires extensive disclosures and court approval among other things, or the creditor can simply hope that the debtor voluntarily repays the debt." Poindexter, 376 B.R. 732, 736 (Bankr. W.D. Mo. 2007) (citation omitted).

The discharge injunction is akin to but not the same as the automatic stay. "Section 524(a)(2) replaces the automatic stay of § 362 with a permanent injunction against enforcement of all discharged debts after entry of the discharge." In re

Goodfellow, 298 B.R. 358, 361 (Bankr. N.D. Iowa 2003) (citation omitted). Whereas 11 U.S.C. section 362(k)(1) expressly authorizes the recovery of actual damages, attorney fees and, in appropriate circumstances, punitive damages for a violation of the automatic stay, section 524(a) is silent on the issue of damages for a violation of the discharge injunction. "Willful violation of the § 524(a)(2) injunction, however, will warrant a finding of civil contempt." Id., 298 B.R. at 361 (citation omitted); see also Poindexter, 376 B.R. at 738. "The burden rests with the movant to show by clear and convincing evidence that the offending creditor had knowledge of the discharge and willfully violated it by pursuing collection activities." Goodfellow, 298 B.R. at 362 (citation omitted); see also Poindexter, 376 B.R. at 738. An award may include punitive damages where the creditor's violation of the discharge injunction was done with "malevolent intent or a clear disregard and disrespect of the bankruptcy laws." Poindexter, 376 B.R. at 739 (citing In re Watkins, 240 B.R. 668, 680 (Bankr. E.D.N.Y. 1999)).

## DISCUSSION

At the time of trial, Harding did not dispute that he had violated the discharge injunction when he filed the lawsuit against the Hopkins. He agreed that the Hopkins should be awarded reasonable attorney fees. He disputed that they should receive any actual damages or punitive damages. He maintained he brought the lawsuit in good faith reliance on the 1970 Iowa Supreme Court case.

Beneficial Finance Company of Waterloo v. Lamos, 179 N.W.2d 573 (Iowa 1970) predates the Bankruptcy Code that was enacted in 1978 and that became effective in 1979. The Court questions how any attorney, let alone a very intelligent and seasoned

attorney like Harding, could consider it appropriate to rely on such a case in light of the requirements set forth in 11 U.S.C. section 524(c) that govern the enforceability of reaffirmation agreements.  Indeed, but one very basic requirement (found in paragraph (3) of that section) is that the agreement must be filed with the bankruptcy court.

Additionally, it has not escaped this Court's attention that Harding omitted any mention of this bankruptcy case in the petition and in the amended and substituted petition.  The Court is willing to conclude that was done intentionally to avoid an early dismissal of the action upon the filing of a motion to dismiss.  Harding wanted an opportunity to depose the Hopkins and to subpoena records related to their debts and gambling activities.  Harding is indeed a very intelligent and seasoned attorney.  (Unfortunately Taylor's references to the lawsuit being a violation of the automatic stay when she should have been saying the lawsuit was a violation of the discharge injunction did nothing to assist the state court judge in assessing the situation before him—all to Harding's advantage.)

As for the repeated references to Charron's Stage 4 cancer in the petition and in the amended and substituted petition, neither Attorney Samuel S. Marks ("Marks") who handled the questioning on behalf of the Hopkins nor Wandro asked Harding why he included such a personal and private matter in the lawsuit.  This Court is left to wonder if Harding included that information because he thought it might resonate in his favor at a jury trial.  Perhaps he intended to upset Diane or to make her feel ashamed for what he perceived to be her taking advantage of Charron.  Whatever the reason, the inclusion of that information did cause Diane angst according to her testimony and that of Jeffrey and Taylor.

Hence, the record contains clear and convincing evidence that Harding was aware of the general discharge order and that he willfully violated the discharge injunction by commencing and continuing his lawsuit in state court. Regardless of whether he acted with malevolent intent toward the Hopkins, his actions caused them actual damages. Specifically the Hopkins are entitled to $1,500.00 in actual damages related to the $462.00 loss of wages for Jeffrey and the emotional distress Diane suffered. Furthermore, the Hopkins are entitled to attorney fees for Taylor's representation in state court and for the Marks Law Firm's representation in this forum. There is no real dispute over Taylor's request for $1,775.00, and this Court will allow that amount. Harding does dispute the Marks Law Firm's request for $11,110.00 in Exhibit 15, a billing statement covering the firm's representation of the Hopkins from February 2, 2012 through September 26, 2012. The objection is based primarily on Zubal charging $250.00 an hour even though she is an associate at the firm. Though the Court does not find that to be a persuasive and compelling argument, the Court is concerned about a lack of specificity regarding which attorney (Zubal or Marks) performed what service for many of the entries on the itemized statement. There are also some charges at full rate for performing administrative and courier services. Accordingly, the Court will allow attorney fees in the amount of $9,000.00 for the Marks Law Firm.

Lastly, with respect to punitive damages, the record contains clear and convincing evidence that Harding acted with a calculated disregard of section 524 and a shocking disrespect for the Bankruptcy Code. The fact that he remains liable on the loan from Iowa State Bank can not be deemed to be a substitute for an award of

punitive damages. Nevertheless, this Court does take that fact into consideration in limiting punitive damages to $10,000.00.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Memorandum of Decision, the Court finds that: The Hopkins have proven by clear and convincing evidence that Harding violated the discharge in junction and that, as a result of that violation, they are entitled to actual damages in the amount of $1,500.00, attorney fees in the total amount of $10,775.00, and punitive damages in the amount of $10,000.00.

A separate Order and Judgment shall be entered accordingly.

/s/ Lee M. Jackwig
Lee M. Jackwig
U.S. Bankruptcy Judge

Parties receiving this Order from the Clerk of Court:
Electronic Filers in this Chapter Case